Jones v. Critchfield. So, Mr. Rosen, you may proceed. Good morning, Your Honor. My name is Max Rosen, and I represent the plaintiffs Atlas Jones and Sophie Smith. I would like to reserve four minutes of my time for rebuttal, if I may. All right. Please watch your clock. Your Honors, I'm prepared to answer the questions outlined in the court's order. Before doing so, I would like, if I can, to take this opportunity to address the merits. Idaho seeks in this case to apply a categorical restroom ban based solely on reproductive capacity at birth to two transgender adult plaintiffs. In this as-applied challenge, Idaho must demonstrate that its sweeping transgender ban is substantially related to achievement of the state's important objectives here, ensuring bodily privacy and safety. Because it cannot do so, we need go no further. No single-user restroom nor case-by-case analysis of building logistics can cure the unconstitutional exclusion at the heart of Idaho's inflexible rule, and enduring a constitutional violation is, per se, irreparable harm. On the merits— Counsel, how do we know that no accommodation could cure on this, where we are now, irreparable harm? I mean, the statute requires the state, the institution, to provide a reasonable accommodation. We are here with regard to specific relief that your clients are seeking, and how do we know that there's no reasonable accommodation that could, for example, be relevant to current irreparable harm? Your Honor, the exclusion of the plaintiffs from the restrooms they've long used that correspond with their gender identity itself is the harm. It's a constitutional violation that the state must justify under heightened scrutiny, and under the statute, were the plaintiffs to request a reasonable accommodation, it's very clear that a reasonable accommodation, and I'm quoting, shall not include access to a restroom, changing facility, or sleeping quarters that is designated for use by members of the opposite sex, while persons of the opposite sex are present or could be present. Go ahead, Judge Bennett, go ahead. So, completely hypothetically, so, again, completely hypothetically, if there were a reasonable accommodation requested, and hypothetically, the reasonable accommodation was, we're going to turn every restroom into a single-user restroom, that also wouldn't cure the problem for irreparable harm? Your Honor, I think, and I don't mean to fight the hypothetical, I think that would be impossible, there are thousands and thousands of people on campus, if you converted every restroom to a single-user restroom, then you would make it impossible for people to go to the bathroom. Restrooms where your clients typically go. If you were to simply convert the restrooms where the clients typically go to single-user restrooms, then I think it would very clearly create an inference, take Sophie, for instance, that there's a transgender person present, I think there would be no way not to out her and create an inference that there's a transgender person in her building, if you solely accommodated in that building by transferring all of the restrooms to single-user restrooms. Can we, yeah, I'm sorry, Judge Christian. There's just a premise, forgive me for interrupting, Judge Bennett. Do we have in this record whether these two plaintiffs have requested an accommodation? It's not in the record, Your Honor, but I did look at that because it was in the court's order, and I can represent that neither has requested a written accommodation for the reasons I've represented. Their understanding is it would be futile to do so. Okay, and your further understanding is you think that it wouldn't cure the problem, because in response to Judge Bennett's questions, you're saying that you think that this would be harmful and stigmatizing. Do we have any indication about what has happened, how the status quo has changed for these two plaintiffs since the time that this law went into effect? I appreciate that, Your Honor. Your Honor's order noted that among the 10 questions, if counsel had any reason to object, then counsel should state so, and we were going to do this if we get to the questions and when we get to the questions, but I would note as to question eight specifically, which is the question that Your Honor, I think, is referring to, we would object to answering that question at this juncture, and I can explain why it's difficult in this context at this time to talk about the question of the status quo, and I would just note that as the question is phrased, the question asks about the use of single occupancy restrooms at the institutions after HB 264 has taken effect, and implicit in the question is that the answer for a particular transgender plaintiff could be, or person, excuse me, could be, that they have not used exclusively single occupancy restrooms because they are continuing to use restrooms that HB 264 prohibits on some occasions and for particular reasons, so the question, as phrased, might require someone, if that were the case, to proffer that they have been acting in a way that could not be complying with the law. That creates a number of important considerations that need to be discussed, I think, before we're in a position to provide that response. Counsel, I appreciate that, and I appreciate, our court granted the leave to file the declarations under seal, and we're really trying to be very cautious here, but I'll just say, and this isn't really even a question, I'm only one of three, but I have a real concern about not only having this argument in a way that guarantees that it is an open hearing, but also we have to contemplate writing an order or decision on the back end, and that would include, for example, allegations sufficient to establish standing, and so I'm only offering that because the parties both stipulated to a posture going forward for this hearing that is not workable for the court, and so I just want to invite you to keep that in mind as we go forward, because at some point, I really appreciate where you're trying to be very careful of your clients, and at some point, this becomes, I don't know if it will be tenable. Well, let me ask a question at this juncture. I mean, there are certain things, facts, that we need to support standing, but also to support harm and to support irreparable harm is what I'm saying, and would it be preferable for your client to remand our questions and have an in-camera hearing before the district court? Your Honor, I want to clarify, if I may, two things. So first, we can answer all the other questions, and second, our objection to question eight isn't a ceiling objection. As phrased, the question could require individuals to disclose whether they're complying with the law. So it's a Fifth Amendment kind of... Well, I would hope that in this context, we wouldn't have to invoke the Fifth Amendment at this stage. There's no criminal liability for violating the statute, is there? I would hope there is not. Some states have attempted to use certain laws to prosecute individuals for violating sex-separated restroom policies, and given that at this juncture, there may be a way for us to handle this going forward, but at the time of this hearing, I don't think we would be in a position to disclose that information because of the potential prejudice. So let me get this straight. So if I read the statute, there's no... It doesn't seem to provide... The statute itself doesn't seem to provide for criminal penalties. It seems to provide for a private cause of action for somebody else who is offended by someone using the bathroom to which they were not assigned at birth. And then, can the institution be held liable under this statute as well? Under the statute itself, the only remedial provision is that an individual who encounters a transgender person or someone that is of the, quote, opposite sex in a restroom can then bring a suit for declaratory injunctive relief and attorney's fees against the institution. And without going into further detail, I would just note that in other states where prosecutors have attempted to bring criminal prosecutions based on sex-separated restroom policies, they have done so using criminal trespass laws. Oh, okay. So that's saying that your clients may be subject to criminal prosecution, notwithstanding the language of this statute. I would first say, I don't intend to give a substantive response to AIDS, so I want to make clear that I'm not doing that at this juncture. And second, I would... I just want to know how this statute works. And I would certainly hope not, Your Honor. Okay. And there's nothing totally taking your two clients out of the mix here. This is a question that is a very general question, has nothing to do with your two clients. You know of no evidence that you could proffer to us that the state or any municipality has initiated or threatened anyone with criminal prosecution for using a restroom that doesn't align with the gender they were assigned at birth. Thankfully, that is correct, Your Honor. Yes, I agree with that. Counsel, does the record tell us whether the buildings where Atlas attends classes have single-user restrooms? Thank you, Your Honor. The record does not. I'm happy to answer that question. That question doesn't fall under the concern we have for question eight. So the answer is, most of them do. Atlas attends classes, but Atlas generally attends classes and spends his time in a number of buildings. So there's the library, which he spends time in. In the library, there are a number of study rooms that go across the library. It's a large building. Counsel, I think, I mean, we have limited time, and so I just want to be helpful. I think the record is clear about the library, and I appreciate that. And I think you've answered my question about the classrooms. It sounds like there's some buildings where he attends classes that don't have single-user restrooms and some that do. Is that right? That is our understanding. That's correct. Okay, that's all I needed. That helps me. Thank you. Judge Wardlaw, would it be acceptable if Mr. Rosen did get to, he indicated except for question eight, he was willing to answer our questions on the record? Would it be acceptable with you and Judge Christin if he were to do that now? It would be acceptable to me. Sure, sure. Yes. And then, Mr. Rosen, we will give you extra time for rebuttal. That was my question, Your Honor. Absolutely. So number one, just to close the loop on it, that asks whether either plaintiff has requested a written request for reasonable accommodation. The answer is no, and we've represented why our understanding is that the answer is no. But factually, they have not. Number two asks— There's actually a second question in number one. Sorry, Your Honor. If so, have the institutions provided with an accommodation in accordance with the statute? No, no, no. I'm sorry. The last question, have the institutions provided anyone with such an accommodation, to your knowledge? Not to my knowledge. I don't know if that's the case. Yeah. Yeah. Question number two, do cisgender students, faculty, or others use the single occupancy restrooms at the institutions? I don't know if that is the case at University of Idaho, but I have no reason to doubt it. At BSU, we do know that is the case. I would flag an important consideration, which is, on the information I have, it is uncommon for a cisgender person to wait at a single-user restroom. So when convenient, a cisgender person will use them. Sometimes they're convenient, they're closer than a multi-occupancy in some occasions, or they're next to a multi-occupancy and unoccupied. It is rare for someone to wait, and our understanding is it would raise suspicions were someone to wait outside of a single-occupancy restroom, especially if multi-occupancy restrooms were available. And that has been the percipient experience that's been related to me. The next question is, based on the information provided in the declarations of Christy Jordan and Rusty Vineyard, do you agree that anyone may use the single-occupancy restrooms at the institutions for any reason? Generally, we do agree, and we think that was the case before HB 264 as well. Question number four, how many hours do Smith and Jones spend at their institutions on the average day they come to campus? For Jones, the record at paragraph 12 of his declaration states five or more hours per day. I can further clarify that, that on the days where he comes to campus for classes, which are three days a week, he spends around eight hours on campus per day. Two other days, he comes for math tutoring. On one of those days, he spends about six hours, and on the other, he spends about three hours. For Ms. Smith, some of that information is in the record at paragraph 14, but is not unredacted. In open court, I can say that she is on campus for long enough to need to use the restroom regularly, but can't provide more granular detail. Question number five is, how far is the nearest single-occupancy restroom from the locations where Smith and Jones spend time on campus? For Smith, as reflected in her declaration, there is no single-occupancy restroom in the two buildings where she spends the majority of her time on campus. That is, as far as I read it, consistent with everything else in the record, including consistent with the Vineyard Declaration, which identifies buildings that do have single-user restrooms, and consistent with the chart that we produced at A232. My understanding is the nearest single-user restroom is approximately two buildings away, and she would have to go outside to use it. For Jones, some of this is not in the record. As to the library, it is in the record, although I will flag that as to the two restrooms that defendants have identified in the library, they are actually labeled multi-stall restrooms. They include multiple stalls, and it is not clear to us that they are in fact single-occupancy. They're not listed on the single-occupancy website even to this day, which is presumably why Atlas did not identify them in his declaration. However, I can confirm he has used them since defendants identified them in their declaration. Hold on, hold on, forgive me on this one. I thought that the circumstance, originally that Atlas thought there weren't any, that through the course of the briefing, that the university pointed out there really are two in the library where Atlas studies, but they're not on the website. Now I just heard you say they're actually multi-users, and he's used them, or are they single-user? I'm not sure if they're multi- or single. Defendants, just one of the questions asks just if we agree with this declaration on this point, and I looked carefully at the photographs that they produced, and I talked to Atlas. So the declaration they produced says there are two single-occupancy restrooms in the first floor of the library. The photographs of those restrooms have signs on the outside that refer to them as multi-stall, and the photographs also include floor plans that indicate that there are multiple, there's a stall in multiple urinals in one, and a stall in a urinal in the other. So we have defendant's representation that they're treating them as single-occupancy, which I appreciate. The actual sign on the door does not indicate that they are single-occupancy restrooms, but I can confirm that Atlas has used them since the declaration was filed. All right, thank you. Additionally, sorry, the question we're on just to come back to it is, how far is the nearest single-occupancy restroom from these individuals? So for Atlas Jones, assuming these are single-occupancy restrooms, the two in the library, there are no others. The library is very large, so there are study rooms across this large building that houses multiple academic departments. Depending on the study room that Atlas uses, you might be very close to those restrooms, or it might be a further walk. I don't know the exact number of minutes. I think it's fairly described as a few minutes and faster if you go outside. So if you're on one side of the building, the multi-occupancy restrooms are much closer. If you are on the other side of the building, then the single-occupancy restrooms are close, comparably to multi-occupancy. In the math building where he tutors, he tutors on the first floor. There's a single-user restroom on the second floor. It's there and it's not far, although it is frequently occupied. He also takes classes in three buildings, the Interactive Learning Center, the Micron Center, and the Multi-Purpose Building. The Interactive Learning Center and Micron Center appear to have single-user restrooms. We are not aware of one in the Multi-Purpose Building, but I do want to flag because I saw how that went back and forth. Below, I'm representing, based on where we are and what we were able to do to investigate, that we are not aware of one, just in case, in fact, there is one somewhere that we are not aware of. So in one of the three buildings where he takes classes, you think, to the best of your knowledge, that there's not a single-user restroom, is that right? Yes. Got it. Okay, thank you. Apologies for interrupting, Your Honor. Not at all, not at all. Question number six is, prior to the enactment of HB 264, did Sophie Smith ever use the institution's single-occupancy restrooms? And the answer is no. She used the women's restroom. Prior to the enactment of HB 264, how often did Jones use the institution's single-occupancy restroom? And the answer, consistent with his declaration at paragraph 14, is that he sometimes did so. That's still the case. I clarified further that he would do so when the restroom was unoccupied, convenient. He would not wait out of a concern that it would look strange if he were waiting, but also just because he wouldn't wait to use a single-occupancy restroom when a multi-occupancy is available, partly because, as the record also reflects, he's had a history of urinary tract infections. And one of the ways he manages in the present is ready and quick access to restrooms. Question eight we've discussed. Question nine is, based on the information provided in Christy Jordan's declaration, do you agree that there are two single-occupancy restrooms in the library where Jones studies, and one single-occupancy restroom in the building where Jones tutors students? Has Jones attempted to use these restrooms? Has he ever been unable to access these restrooms or had to wait to do so? Starting with the library, I explained why I think there's some single-occupancy restrooms, but assuming they are, Atlas has used them and has not had to wait, likely because I think people on campus don't tend to know that they're there. As to the math center, he's also used the single-user restroom there, and he has often had to wait. And finally, question 10 is, do the buildings where Jones attends classes have single-occupancy restrooms? If not, how far are the nearest single-occupancy restrooms? I think we have answered that, but if not, I can give any additional details as relevant. That's the court's questions. I understand that we've gone substantially over time. I'm happy to answer any other question, but I also understand if you would like me to conclude and reserve time for rebuttal. Have we gone over time? I can't see the color of the... Yeah, so it's 3.20 over time right now. Okay, so why don't we hear from Mr. Hurst, and then we will give you time for rebuttal. Okay, Mr. Hurst, you're on mute. Thank you, Your Honor, and good morning. May it please the court, Allen Hurst here for Superintendent Critchfield, the other appellees. Good to see you all again. Glad I can come here and answer your questions, but like my friend on the other side, I'm going to start with the merits, because like them, we don't think these questions ultimately matter. We think under Scarametti, there's no transgender status-based classification here, and we think that even if there is, the law passes, heightens, and scourges. I'll start with that second point. The other side has made a lot of arguments about how we need to focus on specifically the plaintiff's issue and ask whether the state can justify its law based specifically with regard to those two specific plaintiffs, and I think this is not a correct statement of a Supreme Court precedent or this Court's precedent. As Rose said, the state doesn't have to show under heightened scrutiny that its law can satisfy its objectives in every individual instance, and if people are allowed to bring as-applied challenges and focus on individual people, then that's what you're doing. You're forcing the state to justify itself in every individual instance, which would be a very form of narrow tailoring rather than a substantial relationship test. Can I stop you here at the top of this? I'm distracted noticing that the state's interest here in the title of this is an act relating to protecting the privacy of women. Chapter 98 is protecting the privacy of women. The statement of purpose is this legislation will continue Idaho's efforts to protect the rights of girls and women in their private spaces. So given that interest, I have concerns and questions about how 264 really furthers this interest. Again, as we're talking just as to these two individuals, and for starters, I don't know why we care or are considering frankly whether these restrooms, whether the men's restrooms have urinals and whether the urinals are divided. Why are we doing that? Is there some concern that a transgender man is going to be using a urinal? I mean, Atlas isn't. Atlas has said in his declaration he doesn't use them. So he just uses a stall. So can't we set that aside for purposes of this as-applied challenge? I don't think so, Your Honor, because again, the question is whether focusing on the urinal side, and then I'll try to get back to the other side of the question. The question again is whether the state has an interest in like in Roe, like bodily privacy in common spaces of the restroom, which is what's at issue. I think that they don't dispute there's an interest in bodily privacy inside the stalls, etc. And the urinals are not very protective, even the ones that have barriers. Except there's no question Atlas doesn't use them. Atlas is going in and using a stall. We're talking about one human. He says he uses the stall, washes his hands, and leaves. Yes. Well, I mean, so first off, we don't think that we should be focused entirely on Jones. However, you generally have to walk behind urinals, right, to get to the stalls. The urinals tend to be closer to the door. I mean, it's part of the common area where you don't have a door behind you. And so the risk of exposure is greater if somebody is standing next to an urinal, but it is not zero for people who are just walking past in the common area. Okay, so I think your concern is, and I appreciate this is a little awkward to discuss, but I think your concern is that people who are using the urinals might feel like their privacy is invaded. That's what we're right. And so I think that's the answer to the question about why we're concerned about them being divided or not divided. And what's the record show about that as to the restrooms that Atlas uses? I can't speak to the specific restrooms that Atlas uses. I don't think we know which ones those are, in fact, or were used past tense, presumably. But the record doesn't show us that. I don't believe the record shows us that. We have a record that shows us sort of generally what the restrooms look like at the campus. And based on that, I can say that it's, as you'd expect at a large university, it's a wide variety. Some stalls with deep dividers, excuse me, not stalls, some urinals with deep dividers that provide a fair amount of protection. Some stalls with urinals with very small dividers, some with none at all. You can see pictures. Yes. All right, so I've looked at those pictures. Then as to the other, I think the state is continuing the argument that other activities are going on in the common areas of these restrooms. What are we talking about? Changing clothes. I mean, it's mentioned, that's what Judge Nye pointed to in the Roe case. And I think we just have to appeal with lacking further information in the record to the general experience that people have, people seeing people change clothes in the common areas of the restroom. Most people I talk to say, yes, I saw it happen just last week. It is something that does apparently happen and something that the state has an interest in protecting. Now, but to get back to the question about the divide, right, the men's restrooms versus the women's restrooms and the statute's focus on the women's restrooms is, I think the state has an additional interest in the women's restrooms, where in addition to this privacy interest, there's this interest that our expert talk discusses about felt safety and the interest that's discussed in our four affidavits for female students who talk about their concern about using a restroom where biological males might be present and how they would themselves be inclined to avoid such restrooms and then risk all the various problems that are talked about on the other side. This is a problem for everybody who feels unsafe in the restroom, not just for people who identify as transgender. Can I stop you there? Because as to Sophie's case, again, we're talking as applied challenges to humans. And on Sophie's side of the ledger, our record is that she's been doing this for decades without any complaint or concern. Is there something more recent that tells us this has been a problem? All right. So again, I have to fight back on the question because I don't think that as applied gets us past this notion that substantial relationship means, again, it's set in row, it's set in a bunch of Supreme Court cases. Row was a facial challenge. That's correct. Right. It cites Nguyen. And again, look at the Nguyen case where Congress draws a line. It says, we assume that the mother has a relationship with the child and so we're going to let citizenship pass easily. We're not going to assume that the biological father has a relationship with the child and so he has to prove one. And the court said, obviously, this doesn't work out every case. Obviously, there are fathers who are present, unmarried fathers who are present at the birth of the child. Obviously, there are unmarried fathers who do have an ongoing relationship with the child such that citizenship would make sense. And yet Congress doesn't have to account for that. Heightened scrutiny doesn't require that degree of fit between the statute and the people it's being applied to. Counsel, I want to change the focus for my question a little bit. Let's assume hypothetically. And again, hypothetically, let's assume that the court was not on board with your view of the merits. But let's just assume that hypothetically. And let us and I understand your view that if you're right on the merits, then irreparable harm essentially doesn't matter. But I'd like to focus my question on irreparable harm. Let's assume, again, just hypothetically, that the panel thought there was more to the merits than the state does. With regard to irreparable harm, if that's what we were looking at, would the state defendants want the opportunity to get written requests for reasonable accommodations under Section 6b of the statute and have the opportunity from both of these plaintiffs in this applied challenge and have the opportunity to respond as the statute requires? I mean, yes, we would welcome the opportunity in the sense that the opportunity already exists. Nothing is stopping them from submitting these requests. But that's not my question. Would the state want to have that opportunity to see if they could provide a reasonable accommodation that could ameliorate some or all of the claimed irreparable harm to these two plaintiffs? Yes, Your Honor. And without that request, I don't see how they prove irreparable harm because they haven't proven how the law actually applies to them. But I understand that argument. But my question, which you've answered, is the state would want that opportunity? Yes, Your Honor. Moving then again to your questions on the assumption that the panel is disagreeing with me about the merits, we think that the existence of these questions does show that they have failed to meet their burden in proving irreparable harm. And we think the correct response to that situation is not a limited remand. The correct response to that situation is affirmance. If there is no irreparable harm, then the judge and I was right to deny the injunction. And this case can just go back to the district court. And practically speaking for the plaintiffs, I'm not sure what difference there is in that. Because as soon as it's back in the district court, I mean, as soon as the injunction issue is back in the district court, they can develop further evidence and move for another injunction. And the court can hear all of that without there needing to be any sort of limited remand or specific instruction. Although part of the practical difference, at least from my perspective, is that I think that for me, I would benefit from actually having additional facts in order to decide what I find is a not easy motion. So I mean, I take your point that it was plaintiff's burden to develop facts. But there might be some facts that the panel would be particularly interested in, that the best way to get them is to have a fairly quick process, but with focused questions, if these were the ones that were of interest to the panel. Yeah, so my question following up on that is, do you have any reason to believe that if a written request for a reasonable accommodation were made that the state would do anything other than say, point to the existing single occupancy restrooms as a reasonable accommodation? I have to speak very hypothetically in response to this question for two reasons. You know, one, that we don't have the request and we don't know the details of the situations that we would need to be responding to. And two, to the extent that we do have such information about Smith, we can't talk about it in open court. Sorry, I will continue and answer the question. I can say that in response to your question, whichever one it was about the status quo, I've forgotten. Eight, that at the University of Idaho, there is already one building not mentioned in the previous declarations where single occupancy restrooms are currently being installed. I don't know to what extent that is possible. I don't know the extent to which that building is relevant to this case and to Smith's schedule. And I don't know to what extent that's possible in other buildings, but it's being done at one of these schools already. Beyond that, I'm sorry, I shouldn't say that, but it gets into matters in the seal. Yeah, I would urge you to be careful in responding to Judge Wardlaw's questions. I just want to add that we have already issued rulings indicating that we have concern about this alternative that the statute provides. That's what makes this case not so easy, speaking for myself, because it's not the case that there's no alternative. The statute requires that this single-user restroom be made available. And so, one of the reasons we remanded, as you know, in Roe was because the allegation there was that using them might out a student, and that that would be an irreparable harm because once that private information is revealed, it can't taken back, of course. And so, your preface when you respond to Judge, I think it was Judge Wardlaw's question about irreparable harm, I think baked in the notion that if those single-user restrooms are available, we're good to go. No harm, no irreparable harm. And one of the messages that we tried to be clear about in our remand is that we would need information about that. So, and it's one of the things we've asked about regarding the status quo, whether students are using them, whether they're, we don't know whether they're configured in a way where using them would be tantamount to disclosing one's gender identity. So, this record also leaves something to be desired on that point. And for me, that's a very important point. Opposing counsel has made it clear that he thinks using those single-user restrooms is sort of, this is my word, not his, per se stigmatizing. There's something to be said about that. I don't mean to endorse that, but I am trying to tease out where these bathrooms are located and how accessible they are is something that is, it seems to me at least, to be critically important. And Your Honor, I don't think we can answer that question for the record. That's not there. I would dispute that I am assuming that a single occupancy restroom under all circumstances is adequate. But what I am saying is that I think it would be adequate in many or most situations, but this is what the accommodation process is for, right? That if it's not adequate for some reason, they can bring that reason to the institution and they can try to work something out. As it is, the institution has no knowledge of what situation specifically they're concerned about. In terms of the statute, the accommodation has to be reasonable. So I think if they're offering an unreasonable accommodation, that wouldn't work. Exactly, Your Honor. So if you had to go, say, outside in the winter and the snow and walk 200 yards just to get to a single occupancy restroom, that would not be reasonable. In response to that, I'd have to say it would depend on the individual. It would depend on the circumstances. I mean, reasonable is very individual specific, I would say. And so perhaps there are individuals for whom that would not be an issue and would not object to that situation. I don't know. But part of your answer is that in this applied challenge, we would, at least in some circumstances, in going to Judge Wardless hypothetical, it might depend, for example, on, and I'm not saying this with regard to anything in the record about either of these two plaintiffs, but it could depend on, for example, a disability or an inability to walk distances or extreme susceptibility to cold, something like that. And again, I'm not suggesting there's anything in the record on that, but reasonable for a particular person might not be reasonable for some other person. That is my reading of the statute, Your Honor, yes. And once again, that's why we need a request before we can know what the effect of this statute on these people is, because we've not had a chance to work out what the accommodation is. So hypothetically, for someone who has undergone transformation such that for two decades, they've been perceived as one gender, isn't there harm just in being outed by having to use the single occupancy restroom, for example? I mean, and maybe there's even, even if there, I'm saying, could there be a reasonable accommodation that would not affect their being outed? I mean, they'd have to go to the school, they'd have to make a request. And I'm sorry, I lost everybody for a minute, but everybody's back. So sorry. Can you hear me? I keep losing my video, but can you hear me? We can hear you. And we didn't lose your video either. But do you remember my question? Sorry. Yes. And so my response is that first off, on this record, there's just no evidence that using these restrooms would actually out anyone. So far as everybody agrees, it seems that everyone uses these restrooms and that the fact of using these restrooms does not indicate anything about someone's gender identity. In addition to that, we would point out that in order for the loss of the secret to be a harm, it has to be a secret first. And in the case of Atlas Jones, in particular, it is not a secret. Atlas Jones is not a pseudonym. It's a use name. It's used at Boise State. A photo of Atlas Jones is in the public record in this case, not sealed. If you Google Atlas Jones, Boise State, you will find a number of news articles or the like in which Atlas Jones is outed as transgender. So I don't think Atlas Jones has any real interest in keeping a secret of the transgender identity. Smith is another matter. Smith, I think that we would need more facts in the record. And for Smith, we've been hindered significantly, both by the shared desire to keep the identity secret. We have no interest either in disclosing this information publicly and causing problems with this person, but then also by the fact that we didn't even know Smith's identity, actual identity, until after we filed our response brief in the court below. And so we've had no opportunity to put evidence into the record about Smith specifically at all. We've only had to take on faith what they've been saying. At this point, I guess I should add, you know, we are happy to answer the court's questions. And, you know, we do object, however, to the extent that the court is considering issuing an injunction based on the representations of counsel and oral argument that have not been supported by admissible evidence. I don't know if that's what the court's considering, but that doesn't seem to us to be an appropriate procedure. We need an opportunity to respond to some of these things that are being said that we have not heard before. With that, I see I'm over time. I imagine you probably want my answers to the court's 10 questions. Yes. Okay. In that case, you know, question one, let me pull up the actual language of the questions. Question one, you would say no, correct. I think I'll agree that that no, no, excuse me, no accommodation has been requested. To my knowledge, no accommodation has been requested by anyone or given to anyone at this point at either institution. Question two, I think we all agree that cisgender students, faculty and others use the single occupancy restrooms, that there is no limitation that they are open to everybody and used by everybody. Question three, the same, anyone may use these. We stand by the decorations of Jordan Vineyard. Question four, we agree that my friend's description of Jones's schedule sounds accurate to us as far as it's gone. Beyond that, the university does not have information about how much time either of them spends on campus. That's not something the university tracks. How far is the nearest single occupancy restroom from the locations where they spend their time? My understanding is that as was discussed, most of the places that Jones goes, they have a single occupancy restroom inside the building. My understanding is that neither of them is ever more than one, well, locations we're aware of, that neither of them is ever more than one building away from a single occupancy restroom. That seems to be a little bit different from what opposing counsel said, but that's, I don't know how to resolve those facts on the posture we have here. Prior to the enactment, did Smith ever use the single occupancy restrooms? We have no way of knowing that. Prior to the enactment of 264, how often did Jones use the single occupancy restrooms? Again, the declaration says that Jones did use those restrooms, but does not say how often, and we have no way of knowing. Since HB 264 has taken effect, how has the status quo changed? Answer, at the University of Idaho, they have added some additional single occupancy restrooms to a building. I am not sure that that building is relevant to the facts relating to these two people, but that would have to be developed further. And then, of course, if Smith and Jones use single occupancy restrooms, we have no way of knowing. We stand by the Jordan declaration. I was unaware of there potentially being multiple single occupancy restrooms, and we will need to investigate that further, but I see no reason to believe my client's declaration is inaccurate. And then finally, do the buildings where Jones attends classes have single occupancy restrooms? On this point as well, I think we agree with opposing counsel that most of them do, and we think that if there is one that doesn't, I think that the nearest one is only one building away, but we will have to investigate that further. All right. Thank you very much, counsel. You're well over your time, and I'm going to give Mr. Rosen some rebuttal time. Thank you, Your Honor. I want to make a few brief points. I'm happy to address any factual discrepancies between the two sides, but I don't know that we can resolve those purely based on counsel's representations. I understand that. But I want to just sort of come back to the core point, which is, as this court held in Molendras v. Arpaio, it is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury, and that's a preliminary injunction case. And in this case, we have on the merits the problem that as to these two transgender adults, the state cannot demonstrate that it has an exceedingly persuasive justification and that it's substantially related to that justification to exclude Sophie, a transgender woman who's had genital reassignment surgery, and Atlas, a transgender man who has long lived as a transgender man who uses the men's restroom and does so in the context of a law with a stated purpose of specifically protecting women's spaces. The state cannot carry its burden of demonstrating that the categorical line it chose to draw is substantially related to its application to these plaintiffs. That's a merits issue. It's a merits issue that exists regardless of the presence of a single-user restroom. I will note, second, we talk a lot about where single-user restrooms are. I think no one seems to dispute that Sophie's buildings don't have a single-user restroom. No one disputes that sometimes Atlas will be a building away from a single-user restroom, and I think it is clear as a matter of common sense that sometimes a single-user restroom will be occupied when someone wants to use that restroom. But as to outing, which is a sort of concept that we talk about, I think it's really important. We're not just talking about whether using a restroom one time is going to out someone. I understand that using a restroom one time will not invariably out someone. Using a single-user restroom one time will not invariably out either Atlas or Sophie necessarily. Depends on a number of different contextual questions. But that's not what we're talking about. We're talking about an injunction pending appeal, and we're talking about the potential use of single-user restrooms for years. We're talking about the consistent use of those restrooms. If you look at the budget declaration, there's the for instance of young men walking towards a multi-occupancy restroom and the transgender student having to pull away to go use the single-occupancy restroom. That won't happen every time, but when it does, there will be an outing risk. And I would also point out no one disputes that Sophie is not out. I disagree strongly with Mr. Hurt's representation that by openly being a plaintiff in this case, it follows that Atlas is now wearing a sign that says he is transgender, and everyone knows. It's clear in his declaration at paragraph 17 that he's out to his friends, but he's not out to everyone he sees. When he enters a restroom, not everyone in that restroom has read this case and knows that Mr. Jones is transgender. It's not about in this context whether there is a constitutional right to privacy at issue. We don't have to deal with that. That's not the claim in the injunction pending appeal. It's a question of harm. And whether Mr. Jones has or will be harmed if by using exclusively single-user restrooms for years, the effect of that is that over time, more people to whom he did not want to disclose that information start to see him as transgender. When, for instance, when he's tutoring students or when he's otherwise interacting on a regular basis on campus, he wants to be able to be seen just as a person and not always as specifically a transgender person. The last thing I would point out is that I do think Doe v. Horn makes very clear that the nature of this as-applied challenge is proper. In Doe v. Horn, this court refused to find that Arizona's categorical ban of all biological manners defined in the Act from sports was constitutional as applied to a subset of transgender plaintiffs because that subset could demonstrate, just as the District Court's own findings show here, that there wasn't a substantial relationship between the interests the Act sought to serve and its application to those individuals. That is the cornerstone of an equal protection clause challenge, of an as-applied challenge, because the equal protection clause protects persons, not groups. There is nothing inconsistent with that in Winn, which, by the way, involved not a categorical rule but a process whereby a father could establish citizenship for his child, and it was important to Justice Kennedy in that opinion that the statute did include that procedural provision. So in conclusion, Your Honor, I think an injunction is merited here, and I don't think we need to definitively answer all of these factual questions to know that on the current record based on the current law. And I thank you very much for your time. Thank you very much, Counsel. Jones v. Critchfield will be submitted, and the session of the Court is adjourned for today.
judges: WARDLAW, CHRISTEN, BENNETT